UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CARMEN JONES ROBINSON,

    Plaintiff,

     v.

DISTRICT OF COLUMBIA, *et al.*,

    Defendants.

Civil Action No. 03-2082 (CKK)

**MEMORANDUM OPINION**
(December 2, 2005)

Plaintiff Carmen Jones Robinson, individually and as the next best friend of her former

husband Joseph N. Robinson, brings this civil action pursuant to 42 U.S.C. § 1983 and the

Survival Act, D.C. Code § 1201, against Defendants the District of Columbia and Terrence

Gainer, former Executive Deputy Chief of the Metropolitan Police Department ("MPD").[1]

Plaintiff alleges, *inter alia*, negligent and wrongful conduct by agents of the District of Columbia

in the form of police brutality and excessive force during the apprehension of Mr. Robinson by

members of the MPD (Counts I & II); a reckless and indifferent deprivation of Mr. Robinson's

civil rights in violation of the Fourth and Fifth Amendments of the United States Constitution

(Count III); negligent training, supervision, and/or discipline of the MPD officers involved by

Defendants (Count IV); and negligent infliction of emotional distress (Count V).

Currently before the Court is Defendants' Motion for Judgment as a Matter of Law on the

Pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, and for Summary

---

[1] Defendant Gainer is sued in both his official and individual capacities.  *See* Compl. at 1.

Judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure.  Upon a searching

examination of Defendants' motion, Plaintiff's Opposition, Defendant's Reply, the relevant case

law, and the entire record herein, the Court shall grant-in-part Defendants' Motion for Summary

Judgment, and shall dismiss without prejudice Plaintiff's remaining local law claims.

### I: BACKGROUND

At around 12:30 p.m. on October 12, 2000, MPD officers from the Fourth District

responded to a call for a burglary in progress in the vicinity of the 600 block of Hamilton Street,

in the Northwest section of Washington, D.C.  Def.'s Stmt. of Mat. Facts ¶ 1; Pl.'s Response to

Def.'s Stmt. ¶ 1.  Upon encountering a suspect later identified as Joseph N. Robinson, a

protracted chase followed during which Robinson was pursued by eight to ten officers.  Def.'s

Stmt. of Mat. Facts ¶ 2; Pl.'s Response to Def.'s Stmt. ¶ 2; Def.'s Mot. for Summ. J., Ex. A

(Deposition of Stephen B. Keirn (hereinafter, "Keirn Dep.")) at 9:3-10:6; Def.'s Mot. for Summ.

J., Ex. B (Deposition of Ernest Grant (hereinafter, "Grant Dep.")) at 8:10-9:6, 10:8-10:13, 19:2-

14; Def.'s Mot. for Summ. J., Ex. C (Deposition of Sheldon Hargrove (hereinafter, "Hargrove

Dep.")) at 7:14-19.  During this chase, Robinson jumped several fences of varying height, gained

entry into multiple houses, broke a window, and fell from a tree before ultimately climbing to the

rooftop of one of the area houses.  Def.'s Mot. for Summ. J., Ex. A (Keirn Dep.) at 10:14-13:10;

Def.'s Mot. for Summ. J., Ex. C (Hargrove Dep.) at 7:20-9:9.

Robinson was ultimately cornered on the rooftop by Detective Darryl Roberts and MPD

Officers Stephen Keirn and Martin Freeman.  Def.'s Stmt. of Mat. Facts ¶ 3; Pl.'s Response to

Def.'s Stmt. ¶ 3; Def.'s Mot. for Summ. J., Ex. A (Keirn Dep.) at 15:2-9.  Initially, the MPD

officers – both on the roof and below on the ground – sought to obtain Robinson's compliance

through verbal commands.  *Id.*  However, Robinson failed to surrender and comply.  *Id.*
Robinson was not obviously armed, but he was fidgeting, agitated, and moving about.  Def.'s
Mot. for Summ. J., Ex. A (Keirn Dep.) at 16:5-19.  In an effort to effectuate Robinson's arrest,
several of the officers utilized O/C Spray, a form of pepper spray, from a distance.  Def.'s Stmt.
of Mat. Facts ¶ 4; Pl.'s Response to Def.'s Stmt. ¶ 4; Def.'s Mot. for Summ. J., Ex. A (Keirn
Dep.) at 17:15-1818:21 (noting that he gave Robinson two quick bursts of pepper spray –
effective up to twenty feet – from a distance of twelve to fifteen feet); Def.'s Mot. for Summ. J.,
Ex. B (Grant Dep.) at 15:8-16:22 (testifying that he gave Robinson three bursts of pepper spray,
followed by two more bursts);Def.'s Mot. for Summ. J., Ex. C (Hargrove Dep.) at 9:17-10:18
(explaining that officers on the ground also attempted to spray Robinson with mace).  However,
the use of pepper spray had no apparent effect on Robinson, a thirty-three year-old African-
American male who weighed 156 pounds and who was roughly five feet and eight and one-half
inches in height.  *Id.*; *see also* Def.'s Mot. for Summ. J., Ex. D (Report of the D.C. Office of the
Chief Medical Examiner) at 2.  Rather, Robinson, who was described as a "large male . . .
somewhat big" and "sweating," *see* Def.'s Mot. for Summ. J., Ex. A (Keirn Dep.) at 15:7-9,
15:19-20, still refused to submit to arrest.  *Id.*  According to Officer Grant, Robinson wore an
expression that indicated he was "going to hurt somebody," Def.'s Mot. for Summ. J., Ex. B
(Grant Dep.) at 16:12-13, such that the officers could tell

> [t]hat he had intent.  He had some ill intent.  I mean if he wasn't going to get
> away, if somebody put their hands on me, he was basically ready to deal with
> whatever was going to come after that.

*Id.* at 16-20.  The officers were concerned for their safety due to Robinson's strength and refusal
to be subdued.  *Id.* at 19:2-7 ("I've never seen nobody with that kind of strength.  This guy was

strong.").

At this point, Sergeant Hargrove and Officer Colleli joined the officers on the roof in an effort to apprehend Robinson.  Def.'s Mot. for Summ. J., Ex. B (Grant Dep.) at 19:9-14; *id.*, Ex. C (Hargrove Dep.) at 11:1-11.  Confronted by more officers, Robinson attempted to jump from the rooftop.  Def.'s Stmt. of Mat. Facts ¶ 5; Pl.'s Response to Def.'s Stmt. ¶ 5.  However, as Sergeant Hargrove described, "I grabbed him and tr[ied] to prevent him from jumping [off] the roof.  Me and him had a confrontation, and he decided that man, he was going to take one of us off the roof."  Def.'s Mot. for Summ. J., Ex. C (Hargrove Dep.) at 11:1-5.  According to Hargrove, "[h]e started growling, telling me that one of us was going to get off, just thrown off the roof.  I tried to hold him."  *Id.* at 11:15-17; *see also* Def.'s Mot. for Summ. J., Ex. A (Keirn Dep.) at 21:8-13 (Robinson "was pushing off with one hand, had one hand on Hargrove and then had one hand on the roof, and it was almost like pushing off in order to, you know, escape.").  Crying out, "Somebody grab me, I'm falling," Sergeant Hargrove was pulled off balance and towards the alley, which was roughly twenty feet down from the rooftop.  Def.'s Stmt. of Mat Facts ¶ 5; Pl.'s Response to Def.'s Stmt. ¶ 5; Def.'s Mot. for Summ. J., Ex. B (Grant Dep.) at 19:9-14.

In defense of Sergeant Hargrove, Officer Grant struck Robinson with his asp, primarily in his arms and lower legs.  Def.'s Mot. for Summ. J., Ex. A (Keirn Dep.) at 24:3-9; *id.*, Ex. B (Grant Dep.) at 19:17-22:22.  Sergeant Hargrove also pulled out his asp, striking Robinson "several times on the arms and legs."  *Id.*, Ex. C (Hargrove Dep.) at 11:15-22.  Robinson was then brought back completely on the roof, placed face-down on the roof, and put into handcuffs from behind.  Def.'s Stmt. of Mat. Facts ¶ 7; Pl.'s Response to Def.'s Stmt. ¶ 7.  Robinson was

largely uncooperative during the handcuffing process, which took roughly one minute.  Def.'s

Mot. for Summ. J., Ex. A (Keirn Dep.) at 24:12-31:22.

Upon his arrest, Robinson was transported to the Fourth District Headquarters, located at

6001 Georgia Avenue, N.W.  *See* Compl. ¶ 9.  While at the Fourth District, Robinson went into

cardiac arrest.  *Id.*  An ambulance was called, and Robinson was taken to Walter Reed Army

Medical Center, where he was pronounced dead at approximately 1:10 p.m. on October 12, 2000.

*Id.*  An autopsy conducted by Deputy Medical Examiner Dr. Gertrude Juste-Hjardemaal, of the

District of Columbia Department of Health, Office of the Chief Medical Examiner, on October

13, 2000, determined that Robinson's death was "accidental," brought on by "acute cocaine

intoxication with agitated delirium."  Def.'s Mot. for Summ. J., Ex. D. (Report of the D.C. Office

of the Chief Medical Examiner) at 1, 6; *see also id.* 9 (Consultation Report on Contributor

Material) (noting that Robinson's blood tested positive for cocaine metabolite, cocaine, and

morphine).

On October 14, 2003, Robinson's widow, Mrs. Carmen Jones Robinson, brought this

action against Defendants the District of Columbia and former Executive Deputy Chief of the

MPD, Terrence Gainer.  Plaintiff's Complaint contends that "[a]t the time plaintiff's decedent

was beaten, he had done nothing to justify the use of any force whatsoever by members of the

District of Columbia Metropolitan Police Department," Compl. ¶ 10, nor "did the police officers

have any legitimate reason to believe that he posed a threat of serious bodily harm to them or any

third-party," *id.* ¶ 12.  Plaintiff further asserts that "[a]t the time the police officers confronted

Joseph N. Robinson, they had no basis to arrest him nor had any felony offense been committed

nor had any misdemeanor offense been committed in the presence."  *Id.* ¶ 11.  Based upon these

contentions, Plaintiff's Complaint brings an action for (1) wrongful and negligent conduct by Defendants against Joseph N. Robinson under the District of Columbia's Survival Act, D.C. Code § 12-101, *see id.* ¶¶ 15-16 (Count I); (2) negligent excessive force and police brutality by agents of the District of Columbia which, "acting under color of law, approved and/or condoned the wrongful and intentional acts" that were the "direct and proximate" cause of Robinson's death, *id.* ¶¶ 17-21 (Count II); (3) deprivation of Robinson's civil rights, actionable under 42 U.S.C. § 1983, by the MPD's officers, who acted "with deliberate indifference to and reckless disregard for the safety and well-being of plaintiff's decedent, and in violation of the 4th and 5th Amendments to the Constitution," *id.* ¶¶ 22-24 (Count III); (4) negligent training, supervision, and/or training of the officers involved by Defendants, actionable under 42 U.S.C. § 1983, *id.* ¶¶ 23-28 (Count IV); and (5) negligent infliction of emotional distress by the officers on Joseph N. Robinson causing him "severe pain, emotional distress, and mental anguish as he was beaten in the vicinity of 600 Hamilton Street, N.W.," *id.* ¶¶ 29-31 (Count V). Under each of these Counts, Plaintiff "demands judgment against the defendants, jointly and severally, in the full and just amount of Five Million Dollars ($5,000,000.00), plus punitive damages to the extent allowed by law, interest, and costs." *See* Compl. at 4-7.

In opposing Defendants' motion, Plaintiff has offered no testimony challenging the officers' accounts of the events of October 12, 2000, and has produced no expert testimony addressing (1) whether the officers were negligent in effectuating Robinson's arrest; (2) whether the use of force by the officers was excessive based on the circumstances presented; or (3) whether the actions taken by the officers caused and/or contributed to Robinson's death. Rather, Plaintiff's case at this point apparently rests upon two documents that allegedly create a genuine

issue of material fact precluding summary judgment.

The first document relied upon by Plaintiff is the Autopsy Report of Deputy Medical Examiner Dr. Gertrude Juste-Hjardemaal, dated January 19, 2001.  *See* Def.'s Mot. for Summ. J., Ex. D (Report of the D.C. Office of the Chief Medical Examiner); Pl.'s Opp'n, Ex. 4 (same); Pl.'s Response to Def.'s Stmt ¶ 6 (citing the Autopsy Report in detail).  In analyzing the Autopsy Report, Plaintiff contends that "[t]he nature and extent of the injuries detailed [t]herein, as well as the diagram depicting the location of the injuries to the decedent's body, are more consistent with a savage beating than they are with actions taken in self-defense."  Pl.'s Response to Def.'s Stmt. ¶ 6.  Specifically, Plaintiff points to these sections of the report:

### HEAD INJURY EXTERNAL AND INTERNAL

There are several, reddish abrasions to the forehead, the cheek and the chin; there is a ½ inch x 1/4 inch reddish abrasion to the right cheek; there are two, contiguous, reddish abrasions to the right side of the forehead, above the right eyebrow measuring ½ inch x 3/8 inch each; there are two, reddish, linear abrasions at the midline of the forehead measuring in descending order 1/4 inch x 3/16 inch and ½ inch; the left superior eyelid has a reddish abrasion 3/16 inch x 2/16 inch; there is a 2/16 inch scab on the left cheek; the midline of the submental region has a ½ inch x 1/4 inch reddish abrasion . . . . On opening the skill there is a 1-1/4 inch x 1 inch area of galeal and subgaleal hemorrhage in the left occipital region.  There is no calvarial fracture noted.

\*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*      \*

### TORSO

There are several abrasions to the anterior and posterior surfaces of the torso:  The anterior right shoulder has a cluster of several, linear, reddish parallel abrasions measuring 1-1/2 inch[es] by 1 inch.  There is an obliquely oriented, 1 inch x ½ inch reddish abrasion of the left lateral chest below the left nipple.  The right side of the anterior abdominal wall has a cluster of several linear reddish abrasions measuring 1-1/2 inch[es] x 1-1/2 inch[es].  There is a 1-1/2 inch x 1/4 inch abrasion of the right lower abdominal quadrant at the level of the anterior iliac crest.

The left side of the back has several reddish abrasions and contusions:  There is a 1-1/2 inch x 1 inch reddish contusion of the left side of the back at the lateral border of the left scapula;  There are two, obliquely oriented, reddish contusions of the left upper back measuring from lateral to medial ½ inch and 1-3/4 inch[es]; There is a roughly v-shaped abrasion of the left side of the back, at the inferior border and of the left scapula.  The lateral arm of this V is 2-1/2 inches in length and the medial arm measures 1-1/2 inch[es] in length.  There is a 1-3/4 inch x 1 inch, reddish abrasion of the leg flank obliquely oriented downward from medial to lateral.

EXTREMITIES

The left upper extremity shows a 3/8" laceration on the lateral aspect of the elbow; the right upper extremity has a ½ inch x 1/4 inch reddish abrasion of the lateral aspect of the elbow . . . . Dissection of the skin, subcutaneous and muscular tissues of the upper and lower extremities show large focal areas of contusions with deep intramuscular hemorrhage involving the posterior left upper arm muscles and the lateral muscles of the left forearm.

*Id.* (citing Pl.'s Opp'n, Ex. 4 (Report of the D.C. Office of the Chief Medical Examiner) at 3-4).

The second document relied upon by Plaintiff is an eight page, undated letter from William R. Yeomans, Acting Assistant Attorney General, Civil Rights Division of the United States Department of Justice ("DOJ"), to the Honorable Anthony Williams, Mayor of the District of Columbia, and Charles H. Ramsey, Chief of the MPD.  *See* Pl.'s Opp'n, Ex. 5 (DOJ Letter) at 1-8.[2]  The letter specifically addresses an investigation conducted by the DOJ at the request of the Washington MPD to determine "whether MPD officers engage in a pattern or practice of using excessive force."  *Id.* at 1.  Plaintiff points to pages 1-3 and 7 of the letter as supporting her proposition that the document is evidence that the District of Columbia knew that the use of excessive force by its MPD officers "was a longstanding problem."  Pl.'s Response to Def.'s

---

[2] Given the content of the letter, which revealed that the DOJ investigation covered the years 1994 through early 1999, *see* Pl.'s Opp'n, Ex. 5 (DOJ Letter) at 2, and listed the number of fatalities resulting from excessive force for the year 2000, *id.* at 1, it is likely that this letter was written in late 2000 or early 2001.

Stmt. ¶ 8.

On its opening page, Acting Assistant Attorney General Yeomans's letter announces that the DOJ's "investigation did reveal a pattern or practice of excessive force by MPD."  Pl.'s Opp'n, Ex. 5 (DOJ Letter) at 1.  In an effort to remedy this problem, the DOJ attached a Memorandum of Agreement to the letter listing reforms that the MPD should undertake.  *Id.*[3]  At the same time, the DOJ "applaud[ed] the commitment to reducing the risk of excessive use of force demonstrated by [Mayor Williams's] request that we conduct the investigation and assist MPD to identify and begin to correct deficiencies."  *Id.*  The DOJ acknowledged that "MPD has initiated a number of significant reforms in the manner in which it tracks, investigates, monitors, and manages the use of force issues.  Additionally, MPD has committed to implementing these reforms fully in order to ensure effective and respectful policing."  *Id.*  In support of its belief that the District of Columbia was committed to reducing the risk of excessive force, the DOJ pointed out that "in the past two years, MPD has achieved a significant reduction in the rate at which it uses deadly force and the rate at which its canines bite subjects.  In 1998, eleven fatalities resulted from MPD's use of deadly force.  Fatalities decreased to four in 1999 and to two in 2000."  *Id.*

Specifically, the DOJ, "aided by nationally recognized experts in police use of force, reviewed reported use of force, including canine bites, by MPD during the period of 1994 through early 1999.  During this period, approximately 1400 incidents involving uses of force by MPD officers were reported."  *Id.* at 1-2.  Conducting an "in-depth analysis of a stratified random

---

[3] Neither party submits the DOJ's contemporaneous "Memorandum of Agreement" as an exhibit to their filings.  As such, the Court is not aware of the exact content of the  proposed reforms.

sample of the use of force incidents," the DOJ found that "approximately 15 percent of them involved use of excessive force by MPD officers." *Id.* at 2. In contrast, according to the DOJ, "in well-managed and supervised police departments, excessive force would not be expected to occur in more than 1-2 percent of all incidents." *Id.* In addition, the DOJ concluded that "in a significant number of cases, . . . the force used, while lawful, could have been avoided had the officer utilized different tactics." *Id.* Moreover, the DOJ found that "MPD policies regarding the reporting of force to be under-inclusive and inconsistently followed," *id.*, and that there were "serious shortcomings in the quality of MPD use of force investigations," *id.* at 3. Finally, despite the then-recent expansion of the MPD's force training program, the DOJ discovered that the "MPD provided use of force training in an uncoordinated manner with insufficient oversight by MPD policymakers or legal staff. As a result, use of force training was disjointed and, at times, in conflict with applicable law and MPD policy." *Id.* at 6. At the same time, the DOJ recognized that the MPD had already begun addressing these problems, having created "the Force Investigation Team (FIT) in 1999." *Id.* at 4 (noting that "FIT is a group of highly trained and centralized investigators" created by the MPD "to investigate uses of deadly force by MPD officers"). Moreover,

> [s]ignificantly, MPD has undertaken an ambitious and necessary review of all use of force training curricula. MPD's general counsel is now reviewing all of MPD's training materials to ensure compliance with law and MPD policy. Additionally, MPD is creating a training resource library and has updated and computerized its training records. MPD hired a professional curriculum development specialist and is in the process of developing an instructor development course. MPD has also created a training task force made up of individuals from across the Department to conduct a use of force training needs assessment.

*Id.* at 6-7.

10

## II: LEGAL STANDARDS

Defendants bring their present motion pursuant to two different legal theories.  First, Defendants contend that they are entitled to judgment as a matter of law based upon the pleadings under Federal Rule of Civil Procedure 12(c).  Second, Defendants argue that should the Court review matters outside of the pleadings adduced during the discovery process of this case in making its determination, they are entitled to summary judgment under Federal Rule of Civil Procedure 56(c).  In order to lend clarity to Defendants' divergent theories, the Court shall review the relevant legal standards for each form of motion.

A. *Motion for Judgment on the Pleadings Under Federal Rule of Civil Procedure 12(c)*

Rule 12(c) of the Federal Rules of Civil Procedure provides that "[a]fter the pleadings are closed but within such time frame as not to delay the trial, any party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).  The standard of review for motions for judgment on the pleadings under Rule 12(c) is essentially the same as that for motions to dismiss under Rule 12(b)(6).  *Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C. Cir. 1987); *Transworld Products Co. v. Canteen Corp.*, 908 F. Supp. 1, 2 (D.D.C. 1995).  On either motion, the Court may not rely on facts outside of the pleadings and must construe the complaint in the light most favorable to the non-moving party.  *See Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).  The court is limited to considering facts alleged in the complaint, any documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record.  *See St. Francis Xavier Sch.*, 117 F.3d at 624; *Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 n.6 (D.C. Cir. 1993).  Factual allegations in briefs of

memoranda of law may not be considered when deciding a Rule 12(b)(6) motion, particularly when the facts they contain contradict those alleged in the complaint. *Henthorn v. Dep't of Navy*, 29 F.3d 682, 688 (D.C. Cir. 1994); *cf. Behrens v. Pelletier*, 516 U.S. 299, 309, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) (when a motion to dismiss is based on the complaint, the facts alleged in the complaint control). Accordingly, under Rule 12(c) motion, the Court assumes the veracity of all factual allegations set forth in Plaintiff's Complaint. *See Doe v. U.S. Dep't of Justice*, 753 F.2d 1092, 1102 (D.C. Cir. 1985).

Granting judgment on the pleadings pursuant to Rule 12(c) or a motion to dismiss for failure to state a claim under Rule 12(b)(6) is warranted only if it appears beyond doubt, based on the allegations contained in the complaint, that "the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Alicke v. MCI Communications Corp.*, 111 F.3d 909, 912 (D.C. Cir. 1997). "The complaint must be 'liberally construed in favor of the plaintiff,' who must be granted the benefit of all inferences that can be derived from the facts alleged." *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979) (citation omitted). However, while the Court must construe the complaint in the plaintiff's favor, it "need not accept inferences drawn by the plaintiff[] if such inferences are not supported by the facts set out in the complaint." *Kowal*, 16 F.3d at 1276. Moreover, the Court is not bound to accept the legal conclusions of the non-moving party. *See Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997).

B.   *Motion for Summary Judgment Under Federal Rule of Civil Procedure 56*

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Tao v. Freeh*, 27 F.3d 635, 638

(D.C. Cir. 1994).  Under the summary judgment standard, Defendants, as the moving parties,

bear the "initial responsibility of informing the district court of the basis for [its] motion, and

identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits which [it] believe[s] demonstrate the absence of a

genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986).  Plaintiff, in response to Defendants' motion, must "go beyond the pleadings

and by [his] own affidavits, or depositions, answers to interrogatories, and admissions on file,

'designate' specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal

citations omitted).

   Although a court should draw all inferences from the supporting records submitted by the

nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar

summary judgment. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91

L.Ed.2d 202  (1986).  To be material, the factual assertion must be capable of affecting the

substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient

admissible evidence that a reasonable trier-of-fact could find for the nonmoving party.

*Laningham v. U.S. Navy*, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); *Liberty Lobby*, 477 U.S. at

251, 106 S.Ct. 2505 (the court must determine "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must

prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative,

summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50, 106 S.Ct. 2505

(internal citations omitted).  "Mere allegations or denials in the adverse party's pleadings are

insufficient to defeat an otherwise proper motion for summary judgment." *Williams v. Callaghan*, 938 F. Supp. 46, 49 (D.D.C. 1996).  The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).  Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" *Id.* at 587, 106 S.Ct. 1348 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

### III: DISCUSSION

Defendants, in their present motion, contend that judgment is appropriate as to all defendants and as to each count of Plaintiff's five-count Complaint.  Specifically, Defendants argue that (1) Plaintiff's claim against Defendant Terrence Gainer, in his official capacity, should be dismissed as a matter of law, as the District of Columbia is already a party-defendant in this matter, *see* Pl.'s Mot. for Summ. J. at 9; (2) Plaintiff has failed to set forth sufficient facts or proof to establish constitutional liability against Defendant Gainer in his individual capacity, given that he is not a "policymaker" and was not personally involved in or had any personal knowledge of the facts underling Plaintiff's claims, *id.* at 9-10; (3) Plaintiff has failed to set forth sufficient facts or proof to establish constitutional liability against the District of Columbia, as Plaintiff has no evidence to support a showing that the District was "deliberately indifferent" or allowed a "pattern or policy" of excessive force, *id.* at 10-11; (4) Plaintiff, having presented no expert and no direct causal evidence on the matter, cannot establish her negligence claim against the District based on the conduct of the arresting officers, *id.* at 12-13; and (5) Plaintiff has not

14

met her burden in showing that the officers' actions were the proximate cause of the death of

Joseph Robinson, *id.* at 13-14.  In examining Defendants' motion, the Court shall consider each

Defendant *seriatim*, beginning with an analysis of the claims against former Executive Deputy

Chief Gainer and then turning to Plaintiff's claims against the District of Columbia itself.[4]

     A.     *Liability of Defendant Terrence Gainer*

     1.     <u>Liability in Official Capacity</u>

Defendants, in their Motion for Summary Judgment, assert that Plaintiff's claims against

Terrence Gainer, former Executive Deputy Chief of the MPD, in his official capacity should be

dismissed, as they are duplicative of the claims being brought against the District.  *Id.* at 9.  Suits

brought against individuals in their official capacities "generally represent only another way of

pleading an action against an entity of which an officer is an agent."  *Kentucky v. Graham*, 473

U.S. 159, 165, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) (quoting *Monell v. New York City Dep't of

Social Servs.*, 436 U.S. 658, 690 n.55, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).  An official

capacity suit "is not a suit against the official personally, for the real party in interest is the

entity."  *Id.*  This Circuit has recognized that "[a] section 1983 suit for damages against

municipal officials in their official capacities is . . . equivalent to a suit against the municipality

itself."  *Atchinson v. Dist. of Columbia*, 73 F.3d 418, 424 (D.C. Cir. 1996).  Likewise, "a tort

action brought against city officials in their official capacities is equivalent to an action against

the city itself."  *Barnes v. Dist. of Columbia*, Civ. No. 03-2547 (RWR), 2005 WL 1241132, at *3

---

[4] The Court finds it necessary to consult the parties' accompanying exhibits, which include deposition testimony, an autopsy report, and the DOJ letter regarding excessive force, in order to address Defendant's motion.  Accordingly, the Court shall analyze Defendant's motion in the Rule 56 context, rather than under the Rule 12(c) standard.

(D.D.C. May 24, 2005) (citing *Estate of Phillips v. Dist. of Columbia*, 257 F. Supp. 2d 69, 84

(D.D.C. 2003) (dismissing intentional tort claims brought against District of Columbia fire

department officials in their official capacities)).  Accordingly, "a plaintiff seeking to recover on

a damages judgment in an official-capacity suit must look to the government entity itself."

*Graham*, 473 U.S. at 166, 105 S.Ct. 3099.

Based upon the understanding that it is duplicative to name both a government entity and

the entity's employees in their official capacity, courts have routinely dismissed corresponding

claims against individuals named in their official capacity as "redundant and an inefficient use of

judicial resources."  *Cooke-Seals v. Dist. of Columbia*, 973 F. Supp. 184, 187 (D.D.C. 1997);

*Barnes*, 2005 WL 1241132 at *3 (same); *see also Busby v. City of Orlando*, 931 F.2d 764, 776-

77 (11th Cir. 1991) (affirming directed verdict in favor of defendants named in their official

capacity where the city was also named as a defendant because *Monell* obviated the need to sue

officials in their official capacities to substantiate a theory of municipal liability); *Jungels v.*

*Pierce*, 825 F.2d 1127, 1129 (7th Cir. 1987) (citing *Graham* and stating that where plaintiff also

sued the city, "nothing was added by suing the mayor in his official capacity"); *Kiser v.*

*Naperville Cmty. Unit*, 227 F. Supp. 2d 954, 960 (N.D.Ill. 2002) (dismissing claims against

defendants sued in their official capacity and holding that when the entity itself is sued, naming

individual defendants in their official capacities "serves no legitimate purpose"); *Orange v.*

*Suffolk County*, 830 F. Supp. 701, 706-07 (E.D.N.Y. 1993) (dismissing official capacity claims

against county executive and legislators when county itself was sued).  In this case, Plaintiff's

claims against Defendant Gainer in his *official* capacity are clearly duplicative of her claims

against the District itself.  Accordingly, the Court shall grant Defendant's Motion for Summary

Judgment to the extent that it seeks to have Plaintiff's claims against Defendant Gainer in his official capacity dismissed from this suit.

### 2.      Liability in Individual Capacity

Plaintiff attempts to impose liability for the incident at issue on former Executive Assistant Chief Gainer in his individual capacity based upon his supervisory role over MPD officers.[5]   Although Gainer did not personally assault Plaintiff's decedent, Joseph N. Robinson, and therefore did not directly deprive Robinson of his constitutional rights, Defendant Gainer may be liable as the participating officers' supervisor if his "corrective inaction amounts to 'deliberate indifference' to or 'tacit authorization' of the violative practices."  Pl.'s Opp'n at 4 (quoting *Williams v. Willits*, 853 F.2d 586, 588 (8th Cir. 1988)); *see also* Pl.'s Response to Def.'s Stmt. ¶ 8 (arguing that the crux of Plaintiff's claim is "defendants' failure to discipline officers for the inappropriate use of force" and "their failure to properly investigate the use of force by its officer[s]").

As the D.C. Circuit has emphasized, "the overwhelming majority of courts faced with claims of supervisory liability . . . have determined that where responsibility is predicated on inattentiveness rather than affirmative misconduct, the plaintiff must establish a high degree of fault in order to implicate the supervisor in the constitutional infractions of his subordinates." *Haynesworth*, 820 F.2d at 1261.  Therefore, in order to survive summary judgment as to Defendant Gainer in his individual capacity, Plaintiff must present evidence that Gainer had an

---

[5] The Court need not address whether Defendant Gainer has "final policymaking authority" for purposes of individual liability given its finding that there is no evidence of a policy for which any supervisor can be held liable based upon his policymaking position.  *See Triplett v. Dist. of Columbia*, 108 F.3d 1450, 1453-54 (D.C. 1997); *see also infra* Section III(B).

obligation to supervise or discipline the wrongdoers, that this duty was breached through "gross negligence" or "deliberate indifference" to the precautions necessary, and that this breach was the proximate cause of the constitutional violations that occurred. *Id.* at 1260-61. Importantly, the existence of the duty is "triggered by proof that, absent effective supervision, harm was not merely foreseeable, but was highly likely, given the circumstances of the case." *Id.* at 1261.

Here, Plaintiff contends that she has met the requirements set forth in *Haynesworth* to defeat summary judgment as to Defendant Gainer, because

> [h]ere, the plaintiff has alleged exactly that Chief Gainer was in charge of the day to day operations of the Metropolitan Police Department; that he is responsible for the training, supervision, monitoring, and disciplining of Metropolitan Police Officers; that he did with deliberate indifference to and with reckless disregard for the safety and well-being of the plaintiff and the public at large, allow or cause to be committed the acts which deprived plaintiff of his civil rights; that the rogue officers responsible for the beating of the plaintiff were acting under the direction and control, and pursuant to the rules, regulations, policies and procedures, of defendant District of Columbia and implemented by defendant Gainer and that defendant Gainer acted negligently, carelessly, recklessly and deliberately indifferently by failing to properly train, supervise, control, direct and monitor the rogue officers in their duties and responsibilities.

Pl.'s Opp'n at 4-5. However, while such allegations might be sufficient to defeat a Rule 12(c) motion for judgment as a matter of law on the pleadings, to defeat Defendants' Rule 56 motion for summary judgment, Plaintiff must "go beyond the pleadings and by [her] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548 (internal citations omitted).

Unfortunately, Plaintiff has fallen quite short in her obligation to designate "specific facts showing that there is a genuine issue for trial." Upon a review of the record in this case, it does

not appear that Plaintiff ever deposed Defendant Gainer or any other individual who was

qualified to opine as to his responsibilities and role as Executive Deputy Chief of the MPD.  *See*

Pl.'s Opp'n, Ex. 1-5 (attaching only portions of the depositions of Officers Grant, Keirn, and

Hargrove, respectively; the Report of the D.C. Office of the Chief Medical Examiner; and the

DOJ Letter addressed to Mayor Williams); Pl.'s Nov. 5, 2004 Status Report re: Discovery Plan

of the Parties at 1 (listing only Plaintiff and Officers Ross, Hargrove, Grant, and Keirn to be

deposed as part of discovery); *see generally* Pl.'s Opp'n (making no reference to any deposition

of Defendant Gainer or any other individual who could testify as to his responsibilities and

actions).

Rather, the only "evidence" offered by Plaintiff vis-á-vis Defendant Gainer to support her

claim is this contention:  "The defendants have not denied the allegations of complaint ¶ 7

wherein it is clearly alleged that defendant Gainer was in charge of the day to day operations of

the Metropolitan police [sic] Department at all relevant times."  Pl.'s Opp'n at 8; *see also* Compl.

¶ 7 ("Defendant Terrance Gainer [sic] . . . was at the time of the incident which gave rise to this

action, in charge of the day to day operations of the Metropolitan Police Department . . . .").

While the Court notes that Plaintiff's contention that Defendants did not deny the allegations

contained within Paragraph 7 of her Complaint is not entirely accurate,[6] the Court shall assume

---

[6] Defendants' Answer, with respect to Paragraph 7 of Plaintiff's Complaint, actually states:  "The Defendants admit that the District of Columbia is a municipal corporation organized under the laws of the United States, and that Terrence Gainer was the Executive Deputy Chief of Police for the Metropolitan Police Department for the District of Columbia ("MPD") at all relevant times.  The remaining allegations are conclusions of the pleader to which no response is required from these Defendants."  Defs.' Answer ¶ 7.  Accordingly, it is not true that Defendants conceded that Gainer was in charge of the MPD's day-to-day operations; rather, they only conceded his job title.

for the purposes of this motion that Defendant Gainer was responsible for the day-to-day

operations of the MPD.  *See Byrd v. Dist. of Columbia*, 297 F. Supp. 2d 136, 142 (D.D.C. 2003)

(in a similar case, Plaintiff's attorney in this case did take the deposition of Terrence Gainer, who

apparently admitted that "he was responsible for the day-to-day operations of the MPD";

however, the court ultimately found that the plaintiff failed to provide any factual support for his

claim of supervisory liability against Gainer), *aff'd*, 2004 WL 885228 (D.C. Cir. Apr. 26, 2004)

(summary affirmance).

However, even assuming that Defendant Gainer was in charge of the day-to-day

operations of the MPD during the relevant time period, the fact remains that Plaintiff has

presented absolutely no evidence – let alone evidence sufficient to defeat a motion for summary

judgment – to establish that Defendant Gainer "did with deliberate indifference to and with

reckless disregard for the safety and well-being of the plaintiff and the public at large, allow or

cause to be committed the acts which deprived [Robinson] of his civil rights."  Pl.'s Opp'n at 4-

5; *see* Def.'s Mot. for Summ. J. at 10 ("Other than allege that defendant Gainer was responsible

for training and supervision, the record is silent as to any constitutional misconduct committed by

this defendant.").  Importantly, Plaintiff "provides no evidence . . . that Gainer individually had a

duty to oversee a pending investigation into an incident of alleged officer misconduct, to discover

the results of such an investigation, or to discipline officers upon resolution of an investigation."

*Byrd*, 297 F. Supp. 2d at 142-43 (citing *Beatty v. Lanham*, Civ. No. 92-7095, 1994 WL 581458,

at *1 (4th Cir. 1994) (summary judgment is proper for supervisory defendants where plaintiff

fails to establish an obligation regarding the alleged violation)).  Indeed, Plaintiff has presented

no evidence that Defendant Gainer was even aware of the incident involving Plaintiff's decedent,

20

Joseph N. Robinson, such that his alleged inaction could have been the result of "deliberate indifference." *See Ottman v. City of Independence, Mo.*, 341 F.3d 751, 761 (8th Cir. 2003) (supervisor was not deliberately indifferent where he did not "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see") (internal quotation and citation omitted).

Moreover, "in addition to [a lack of] any factual support for a claim of supervisory liability, there is a lack of any evidence that Gainer's supposed 'corrective inaction' brought about the assault on plaintiff in this instance." *Byrd*, 297 F. Supp. 2d at 143 (citing *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 583 (1st Cir. 1994) (summary judgment for supervisor defendant is proper where the "record is bereft of any proof, direct or inferential, of a causal link between [the supervisor's] activities and the alleged deprivation of constitutional rights"); comparing *Carter v. Barker*, Civ. No. 99-1433, 2000 WL 1008794, at *7 (4th Cir. 2000) (plaintiff defeated defendant's summary judgment motion by demonstrating that supervisor was aware of constitutional violations, and had witnessed them occurring, yet failed to take any steps to prevent continued violations but instead facilitated them)).

Given Plaintiff's failure to produce any evidence connecting Defendant Gainer to her claims of supervisory liability and corrective inaction, Plaintiff has not satisfied her burden of demonstrating that Defendant Gainer was involved in and/or liable for the alleged violation of Robinson's civil rights. Accordingly, Defendants' Motion for Summary Judgment is granted to the extent that is seeks full dismissal of Defendant Gainer from this case.

B.     *Municipal Liability*

Under Counts III and IV of her Complaint, Plaintiff seeks to hold the District of

Columbia liable for constitutional violations allegedly committed by its police officers through

the avenue provided by 42 U.S.C. § 1983. *See* Compl., Count III (Deprivation of Civil Rights,

42 U.S.C. § 1983); Count IV (Negligent Training, Supervision and/or Discipline, 42 U.S.C. §

1983). In contrast, Defendants maintain that "Plaintiff has failed to set forth sufficient facts or

proof to establish constitutional liability against the District." Pl.'s Opp'n at 10. Specifically,

Defendants stress that "Plaintiff fails to raise a material issue of fact as to whether a policy of the

District was the driving force behind the officers' conduct during the arrest, and further fails to

raise a material issue as to whether the District's final policymakers either knew or should have

known of the pervasive pattern of alleged misconduct that was proximately related to any

constitutional harm to the decedent, Joseph Robinson." *Id.* at 11.

    1.   <u>Standards</u>

Title 42 U.S.C. § 1983 provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or
> usage, of any State or Territory or the District of Columbia, subjects, or causes to
> be subjected, any citizen of the United States or other person within the
> jurisdiction thereof to the deprivation of any rights, privileges, or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. Under *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018,

56 L.Ed.2d 611 (1978), municipalities and other local government bodies may be held liable

under Section 1983 as "persons" for the deprivation of a plaintiff's constitutional rights. *Id.* at

689, 98 S.Ct. 2018. However, a municipality may not be held liable under principles of

*respondeat superior*, but instead only where its own "policy or custom . . . inflicts the injury."

*Id.* at 694, 98 S.Ct. 2018; *see also Bd. of the County Comm'rs of Bryan County, Oklahoma v.*

*Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("We have consistently

refused to hold municipalities liable under a theory of *respondeat superior*.").  "Locating a

'policy' ensures that a municipality is held liable only for those deprivations resulting from the

decisions of its duly constituted legislative body or of those officials whose acts may fairly be

said to be those of the municipality."  *Brown*, 520 U.S. at 403-04, 117 S.Ct. 1382 (citing *Monell*,

436 U.S. at 694, 98 S.Ct. 2018).  "Similarly, an act performed pursuant to a 'custom' that has not

been formally approved by an appropriate decisionmaker may fairly subject a municipality to

liability on the theory that the relevant practice is so widespread as to have the force of law."  *Id.*

at 404, 117 S.Ct. 1382 (citations omitted).

However, significant hurdles remain for a plaintiff asserting municipality liability under

Section 1983.  "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly

attributable to the municipality.  The plaintiff must also demonstrate that, through its *deliberate*

conduct, the municipality was the 'moving force' behind the injury alleged."  *Id.* (emphasis in

original).  Accordingly, "a plaintiff must show that the municipal action was taken with the

requisite degree of culpability and must demonstrate a direct causal link between the municipal

action and the deprivation of federal rights."  *Id.*

The failure to train, supervise, or discipline city employees can constitute such a policy or

custom if it amounts to "'deliberate indifference' towards the constitutional rights of persons in

its domain."  *Daskalea v. Dist. of Columbia*, 227 F.3d 433, 441 (D.C. Cir. 2000) (quoting *City of*

*Canton v. Harris*, 489 U.S. 378, 388-89 & n.7, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)); *see*

*also Carter v. Dist. of Columbia*, 795 F.2d 116, 122 (D.C. Cir. 1986) (a municipality's failure to

adequately train, supervise, investigate, and discipline police officers can give rise to municipal

liability if that failure represents city policy and deliberate indifference).  Deliberate indifference

is determined objectively, "by analyzing whether the municipality knew or should have known of

the risk of constitutional violations," and yet failed to respond as necessary.  *Baker v. Dist. of

Columbia*, 326 F.2d 1302, 1307 (D.C. Cir. 2003).  To prevail, the plaintiff must show more than

simple or even heightened negligence; the municipality's negligence must be conscious, or at

least reckless.  *See City of Canton*, 489 U.S. at 389, 109 S.Ct. 1197.

2.      Application in the Context of Plaintiff's Claims

In the present case, Plaintiff alleges that the District of Columbia "failed to have a policy

in place to address the wanton abuses by its officers of the civil rights of the citizens of the

District of Columbia . . . ."  Pl.'s Opp'n at 7.  Due to this policy failure, Plaintiff contends that

the District has a "longstanding problem" of which it is fully aware such that it consistently fails

"to discipline officers for the inappropriate use of force" and fails "to properly investigate the use

of force by its officer[s]."  Pl.'s Response to Def.'s Stmt. ¶ 8.  According to Plaintiff, this policy

failure was "the proximate and foreseeable cause of the injuries suffered by plaintiff's decedent."

Pl.'s Opp'n at 7.

Problematically, Plaintiff's Opposition simply recounts the facts surrounding her claim of

excessive force as applied on Joseph Robinson and then, without any citation or reference to

supporting evidence, implies that there was a "poor investigation conducted following the use of

force" on Robinson.  Pl.'s Response to Def.'s Stmt. ¶ 8.  A review of the record before the Court

demonstrates that Plaintiff has presented absolutely no evidence indicating (1) how the officers

involved in the October 12, 2000 incident were trained by the District with respect to the use of

their pepper spray or baton asps; (2) how that training was at variance with proper police

24

procedures; (3) what investigation, if any, was ever conducted by the District into the events at issue; (4) how such an investigation, if any, was inadequate; (5) what discipline, if any, occurred; and (6) how such discipline or non-action was contrary to established norms.  At best, taking Plaintiff's Opposition on its face, Plaintiff is simply asserting that during the arrest of Joseph Robinson, officers of the MPD used excessive force.  Such a claim, by itself, without any further evidence of how the policies and practices applied to Robinson were inadequate or contrary to law, is insufficient to establish a Section 1983 claim against the District.

Even assuming *arguendo* that Plaintiff had adduced some evidence supporting her argument that the officers involved were not disciplined properly, her claim is still insufficient as a matter of law, as a single incident is clearly insufficient to establish the existence of a policy amounting to "deliberate indifference."  *City of Oklahoma v. Tuttle*, 471 U.S. 808, 823-24, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985).  Perhaps recognizing the need for more than a single incident, but providing no analysis whatsoever, Plaintiff attaches a letter summarizing and referencing a Memorandum of Agreement ("MOA") between the United States Department of Justice ("DOJ"), the District of Columbia, and the MPD, and relies entirely on this document as proof of a pattern or practice by the District of failing to investigate and discipline officers for their excessive use of force.  *See* Pl.'s Opp'n, Ex. 5 (DOJ Letter).  Having conducted a searching review of this letter, the Court joins with the *Byrd* court in rejecting Plaintiff's

> lame attempt to transform the mere existence of a MOA into a policy or custom of deliberate indifference, for the MOA does not provide any evidence of specific instances of the District's failure to discipline, and if anything, it demonstrates not deliberate indifference, but rather, an effort to improve its practices and procedures relating to the investigation and discipline of police misconduct.

*Byrd*, 297 F. Supp. 2d at 140.

Some background is necessary to understand this conclusion.  In January 1999, more than twenty-two months before the incident at issue, Mayor Anthony Williams and MPD Chief Charles Ramsey requested that the DOJ review all aspects of the MPD's use of force.  *See id.* (providing a background to the MOA).  Under this review, the DOJ analyzed every reported use of force and every citizen allegation of the use of excessive force that occurred between 1994 and 1999.  *See* Pl.'s Opp'n, Ex. 5 (DOJ letter) at 1-2.  After the DOJ's investigation, the District, DOJ, and MPD executed the MOA, in which the DOJ set forth a series of policies, procedures, and practices that the District and MPD must employ regarding officers' use of force, incident investigation, officer supervision and training, and disciplinary action.  *Id.*; *see also Byrd*, 297 F. Supp. 2d at 140.  While the MOA was not executed until June 2001, roughly four months prior to the incident in question, by that time the MPD had already initiated a number of notable policy reforms related to the use of force based on the DOJ's on-going technical assistance recommendations regarding the MPD's use of force policies and procedures, training, investigations, and complaint handling.  *Id.* at 1 ("We acknowledge that because of your efforts, MPD has initiated a number of significant reforms in the manner in which it tracks, investigates, monitors, and manages use of force issues."); *Byrd*, 297 F. Supp. 2d at 140.[7]

As Plaintiff seems to suggest, *see* Pl.'s Response to Def.'s Stmt. ¶ 8, it may be fair to infer that the MOA reflects an awareness by the District of serious allegations relating to its use of excessive force and its investigations of such use of force.  However, a mere awareness of a

---

[7] Pursuant to these pre-MOA reforms, the MPD reduced the rate at which it uses deadly force, such that while eleven (11) fatalities resulted from the MPD's use of deadly force in 1998, fatalities decreased to four (4) in 1999 and to two (2) in 2000.  Pl.'s Opp'n, Ex. 5 (DOJ Letter) at 1.

problem in January 1999 and a need for improvement is not, as a matter of law, sufficient to

impose municipal liability for an incident that occurred in October 2000.  *See Byrd*, 297 F. Supp.

2d at 140 (finding that "a mere awareness in 1999 of a problem and a need for improvement is

not, as a matter of law, sufficient to impose municipal liability for an incident that occurred in

2001"), *aff'd*, 2004 WL 885228 (D.C. Cir. 2004) (per curium).

When analyzing the introductory letter attached by Plaintiff and descriptions of the MOA,

two important legal points become obvious.  <u>First</u>, and perhaps most significantly, the MOA

conclusively demonstrates that the District was not indifferent to the problems with the MPD, as

suggested by Plaintiff.  Rather, the District was taking affirmative steps as early as January 1999

to remedy the situation.  Indeed, the DOJ itself commended the District's "unprecedented

request" for the DOJ's investigation and recommendations and notes that this request "indicated

the City and the Chief's commitment to minimizing the risk of excessive use of force in [MPD]

and to promoting police integrity."  *Byrd*, 297 F. Supp. 2d at 140 (quoting the MOA).  The DOJ

further applauded the multiple reforms implemented by the District and MPD well in advance of

the July 2001 effective date for the MOA.  *See* Pl.'s Opp'n, Ex. 5 (DOJ Letter) at 1.  As the *Byrd*

court stressed, "[f]rom the MOA, it is clear that the District was adopting a proactive remedial

approach, and it was, as early as 1999, attempting to reform its practices to eliminate the

problems of the past."  *Byrd*, 297 F. Supp. 2d at 140-41 (comparing *Daskalea*, 227 F.3d at 442

(jury had sufficient evidence to find deliberate indifference where there was, along with ample

evidence of multiple incidents, a lack of evidence that a training program or any other corrective

measure had been implemented)).

Plaintiff's reliance on the existence of the MOA to support her claims is inherently

illogical.  Under Plaintiff's approach, "a municipality would be ill-advised to evaluate its

operational practices or to institute reforms lest its efforts be labeled as a policy or custom of

deliberate indifference."  *Byrd*, 297 F. Supp. 2d at 141.  As pointed out by the *Byrd* court, the

Supreme Court has specifically rejected this approach:

> [O]ur cases have never held that improvements in the reliability of new
> procedures necessarily demonstrate the infirmity of those that were replaced.
> Other areas of law, moreover, have for strong policy reasons resisted rules
> crediting the notion that, "'because the world gets wiser as it gets older, therefore
> it was foolish before.'" . . . [W]e believe the same principle that the Government
> ought not be penalized and told to "try harder" simply because the [department]
> has since upgraded its policies.

*Dusenbery v. United States*, 534 U.S. 161, 172, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002) (internal

citations omitted).

    <u>Second</u>, Plaintiff may not rely on the MOA to fill the void left by her lack of any

statistical evidence or evidence of other failures to investigate and discipline officers for

excessive use of force.  *See Byrd*, 297 F. Supp. 2d at 141.  As noted previously, Plaintiff here

relies only on the existence of a MOA and bald assertions that the District somehow had or still

has an inadequate policy or practice regarding the use of excessive force.  Plaintiff's proof – or

lack thereof – is woefully short compared to cases in this Circuit where courts have weighed

whether there was evidence of pervasive misconduct sufficient to subject a municipality to

Section 1983 liability.  For instance, in *Carter*, the plaintiff – bringing a claim similar to the one

here – actually provided testimony of other specific instances of misconduct and had some

limited statistical evidence demonstrating that complaints of police brutality were not

investigated nor were the officers sanctioned.  *See Carter*, 795 F.2d at 123-24.  The D.C. Circuit,

however, regarded this evidence as insufficient for the purposes of Section 1983, as the testimony

of actual occurrences was "scattered and [the occurrences did] not coalesce in a discernable

'policy,'" and the plaintiff's statistics "were too general to prove any pattern or policy." *Id.*  In

contrast, in *Daskalea*, the plaintiff's deliberate indifference claim against the District's

correctional officers was adequately supported by evidence of numerous incidents of open and

notorious constitutional violations committed after a court had already found liability for a failure

to train officers to prevent such misconduct.  *Daskalea*, 227 F.3d at 441-42; *see also Cox v. Dist.

of Columbia*, 821 F. Supp. 1, 15-16 (D.D.C. 1993), *aff'd*, 40 F.3d 475, 1994 WL 609522 (D.C.

Cir. 1994) (plaintiff's claim of failure to discipline officers for excessive force was sufficiently

supported by "extremely detailed statistical information" of a failure to process excessive force

complaints along with specific illustrations of the negative consequences of the District's dilatory

conduct).

As such, judged against the level of exacting proof demanded by the cases in this Circuit,

Plaintiff has presented insufficient evidence to avoid summary judgment as to Counts III and IV

of her Complaint brought pursuant to Section 1983.  Accordingly, the Court shall grant

Defendants' Motion for Summary Judgment as it relates to Count III (Deprivation of Civil

Rights, 42 U.S.C. § 1983) and Count IV (Negligent Training, Supervision and/or Discipline, 42

U.S.C. § 1983) of Plaintiff's Complaint.

### C.    *Plaintiff's Remaining Claims*

At this point, with summary judgment awarded to Defendant Gainer in full and to

Defendants on the two counts of Plaintiff's Complaint brought pursuant to Section 1983 (Counts

III and IV), the only remaining claims left are Count I (D.C. Survival Act), Count II (Negligence

- Excessive Force/Police Brutality), and Count V (Negligent Infliction of Emotional Distress).

29

Importantly, the federal civil rights claims outlined in Counts III and IV provided the Court with subject matter jurisdiction in this case, while the remaining claims arise from local law.  Under Title 28 U.S.C. § 1367(c)(3), "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under if . . . the district court has dismissed all claims over which it has original jurisdiction."  Pursuant to 28 U.S.C. § 1367(c)(3), the Court shall dismiss without prejudice Counts I, II, and V of Plaintiff's Complaint, and close this case.  Plaintiff may file the remaining non-federal claims in Superior Court.

## IV: CONCLUSION

For the reasons set forth above, the Court shall grant-in-part Defendants' Motion for Summary Judgment.  The Court grants summary judgment in full to Defendant Gainer, and grants summary judgment to Defendants as to Counts III and IV of Plaintiff's Complaint.  However, given that Plaintiff's remaining claims are based on local law, the Court shall decline to exercise supplemental jurisdiction and shall instead dismiss without prejudice Counts I, II, and V of Plaintiff's Complaint.  An Order accompanies this Memorandum Opinion.


Date:   December 2, 2005


_____/s/_____
COLLEEN KOLLAR-KOTELLY
United States District Judge